UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-cv-20301-JAL

SECURITIES AND
EXCHANGE COMMISSION,

        Plaintiff,

vs.

MATHIAS FRANCISCO SANDOVAL
HERRERA and MARIA D. CIDRE,

        Defendants.
_____/

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S *DAUBERT*
MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MAUREEN CHAKRABORTY**

**SECURITIES AND EXCHANGE COMMISSION**
James M. Carlson
Olivia S. Choe
Kevin C. Lombardi
Rachel Nonaka
Mark Oh
100 F Street N.E.
Washington, DC 20549
Facsimile: (202) 772-9291

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................................1

II. RELEVANT FACTUAL BACKGROUND ..........................................................................1
    A. The SEC's Case against Defendant Cidre ................................................................1
    B. Chakraborty's Purported Expert Opinions ...............................................................4

III. LEGAL STANDARD ............................................................................................................6
    A. Rule 702 and the *Daubert* Standard .........................................................................6
    B. Proposed Expert Opinions Must Also Be Analyzed under Fed. R. Evid. 403 ..........6
    C. An Expert's Opinions Cannot Dictate to the Jury What Result to Reach
       Nor Can They Usurp the Court's Role in Instructing the Jury About the Law ..........7

IV. ARGUMENT ..........................................................................................................................8
    A. Chakraborty's Opinions Cannot Be Allowed to Decide the Issue of Materiality ......8
    B. Chakraborty's Use of the Term "Economic Materiality"
       Is a Transparent Attempt to Insulate Her Opinions from
       *Daubert* Attack and Will Necessarily Lead to Jury Confusion ................................10
    C. Chakraborty Should Not Be Allowed to Offer Her
       Opinions in an Improper Attempt to Instruct the Jury
       Regarding the Meaning of the Term "Reasonable Investor" ...................................12

V. CONCLUSION .....................................................................................................................14

VI. REQUEST FOR HEARING ................................................................................................15

# **TABLE OF AUTHORITIES**

**Cases**

*Allison v. McGhan Medical Corp.*,
    184 F.3d 1300 (11th Cir. 1999) .......................................................................................... 7

*Brown v. NCL (Bahamas) Ltd.*,
    190 F. Supp. 3d 1136 (S.D. Fla. 2016) (Lenard, J.) ........................................................... 6

*Commodores Entertainment Corp. v. McClary*,
    879 F.3d 1114 (11th Cir. 2018) .......................................................................................... 7

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ....................................................................................................... 1, 7

*Hoefer & Arnett, Inc. v. Lehigh Press, Inc.*,
    Case No. 86-7016, 1988 WL 12505 (E.D. Pa. Feb. 16, 1988) .......................................... 9

*Hull v. Merck & Co., Inc.*,
    758 F.2d 1474 (11th Cir. 1985) .......................................................................................... 7

*In re BankAtlantic Bancorp, Inc. Securities Litigation*,
    Case No. 07-61542-CIV, 2010 WL 6397500 (S.D. Fla. Aug. 18, 2010) ........................... 9

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................................................... 6

*McCorvey v. Baxter Healthcare Corp.*,
    298 F.3d 1253 (11th Cir. 2002) .......................................................................................... 6

*Montgomery v. Aetna Casualty & Surety Co.*,
    898 F.2d 1537 (11th Cir. 1990) .................................................................................... 9, 13

*SEC v. Kirkland*,
    521 F. Supp. 2d 1281 (M.D. Fla. 2007) ............................................................................. 8

*SEC v. Monterosso*,
    Case No. 07-61693, 2008 WL 11333251 (Sept. 26, 2008) (Lenard, J.) ............................ 8

*SEC v. Morgan Keegan & Co., Inc.*,
    678 F.3d 1233 (11th Cir. 2012) ........................................................................................ 11

*TSC Indus. v. Northway*,
    426 U.S. 438 (1976) ......................................................................................................... 11

-iii-

*United States v. Duncan*,
    42 F.3d 97 (2d Cir. 1994) ...................................................................................................9

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ..........................................................................................6

*United States v. Herring*,
    955 F.2d 703 (11th Cir. 1992) ............................................................................................8

*United States v. Milton*,
    555 F.2d 1189 (5th Cir. 1977) ............................................................................................7

*United States v. Rouco*,
    765 F.2d 983 (11th Cir. 1985) ............................................................................................7

**Other Authorities**
Eleventh Circuit Pattern Jury Instructions (2018). ......................................................................11

**Rules**
FED. R. EVID. 403 ..........................................................................................................................7

FED. R. EVID. 702 .......................................................................................................................6, 7

Plaintiff Securities and Exchange Commission (the "SEC"), pursuant to the Order dated March 9, 2018 [D.E. # 105], moves this Court for an Order precluding Defendant Maria D. Cidre ("Cidre") from offering evidence or argument, or mentioning in any way in the presence of the jury, including in opening and closing statements, the purported expert report and testimony of Ms. Maureen Chakraborty ("Chakraborty") – one of Cidre's disclosed expert witnesses in this case.

I. **INTRODUCTION**

The SEC seeks to exclude Chakraborty's proffered opinions for three reasons. First, they are a thinly cloaked attempt to allow Chakraborty to inappropriately testify to the jury about the legal implications of Cidre's conduct and ultimately seek to decide the issue of materiality for the jury. Second, certain terms and concepts used by Chakraborty in her analysis such as "economic materiality" and her separate definition of a "reasonable investor" are in direct conflict with their definitions within Eleventh Circuit case law and the Pattern Jury Instructions. This conflict will undoubtedly lead the jury into unnecessary confusion about these concepts. Third, Chakraborty's opinions invade the purview of this Court by attempting to instruct the jury as to the definition and impact of various legal terms, and instructing the jury as to the law is solely within the domain of this Court. Thus, Chakraborty's purported expert opinions do not comply with the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), its progeny, or the Federal Rules of Evidence. Accordingly, the Court should exclude her opinions.

II. **RELEVANT FACTUAL BACKGROUND**

    A. **The SEC's Case against Defendant Cidre**

This case involves Cidre's fraudulent acts by actively concealing a known inventory accounting overstatement from the senior corporate officers of her former company, General Cable Corporation ("GCC" or the "Company"), and GCC's shareholders. Until Prysmian Group's

acquisition of GCC in June 2018, GCC was a global manufacturer of copper, aluminum, and fiber optic wire and cable products, with its headquarters in Highland Heights, Kentucky. [D.E. # 107, 4/11/18 Order denying Defs.' Mot. to Dismiss at 2.]  GCC's Corporate CEO, Gregory Kenny ("Kenny"), and its CFO, Brian Robinson ("Robinson"), were both located at the Company's headquarters.  The business segment of GCC that included GCC's operations in Brazil ("GCC Brazil") was GCC's "Rest of World" segment ("ROW" or "GCC ROW"). [D.E. # 107 at 2.]  During the relevant period, Cidre was GCC ROW's CFO.  Defendant Mathias Francisco Sandoval Herrera ("Sandoval") was GCC ROW's CEO, and Defendant Jose Antonio Miranda Gonzalez ("Miranda") was GCC ROW's Senior Vice President for Latin America.[1] Ultimately, Cidre and Sandoval had reporting obligations to GCC's Kenny and Robinson.

In January 2012, in her position as CFO of GCC ROW, Cidre learned of a $12 million inventory overstatement arising from a suspected theft.  She knew that such an overstatement would have "detrimental consequences" for her job and GCC and its shareholders.  From January 2012 to September 2012, rather than reporting the overstatement to the GCC's Corporate CEO or CFO in Kentucky, Cidre violated the Federal Securities Laws by, among other things:

(1) falsely certifying three Sarbanes-Oxley sub-certifications representing to the Corporate CEO and CFO there were no reportable issues in ROW;

(2) subverting GCC's internal controls by hiding the inventory overstatement issues from GCC's auditors;

(3) further subverting the Company's internal controls by omitting any mention of the inventory overstatement issues ROW's Monthly Reports to from GCC's auditors; and

(4) ordering Miranda to delete certain Company emails.

---

[1] On March 21, 2017, the Court entered a Judgment against Miranda as to liability based on his consent agreement with the SEC. [D.E. # 24.] On November 13, 2018, the Court stayed the case against Sandoval so that the five-member Commission can consider and approve his settlement offer. [D.E. # 121.]

[D.E. # 1, Compl. at ¶¶ 29-30, 38-45.]

By the summer of 2012, the inventory overstatement grew to approximately $29 million, but Cidre continued her acts of concealment, omission, and misrepresentation. [D.E. # 107 at 5-6.] In late September 2012, Cidre met with a senior GCC cost accountant, Leonardo Soto ("Soto"), who had investigated the inventory overstatement in May 2012 and had inspected both of GCC ROW's Brazilian plants, and contemporaneously reported to Cidre that GCC Brazil's inventory controls were "total trash." Soto once again confirmed to Cidre that GCC Brazil had a significant inventory overstatement and accounting discrepancy, but now the amount of the overstatement was approximately $40 million. [*Id*. at 6.] Despite these repeated warnings, mounting red flags, and Soto's investigative findings, Cidre ultimately signed and submitted three false and misleading Sarbanes-Oxley sub-certifications with GCC Corporate on February 1, April 23, and July 23, 2012. [*Id*. at 7.]

In each sub-certification, Cidre verified, among other things: (1) no knowledge of fraud or suspected fraud; (2) no significant deficiencies and/or material weaknesses in GCC ROW's internal controls; and (3) no violations or possible violations of laws whose effects should be considered for disclosure in the Company's financial statements. [D.E. # 107 at 7-8.] GCC's CEO and CFO relied on those sub-certifications when certifying GCC's consolidated financial statements with the SEC. [*Id*. at 7.] As a result of Cidre's misconduct, GCC filed with the SEC and distributed to the public materially false financial statements for the year ended December 31, 2011 and the quarters ended March 30, 2012 and June 29, 2012. [*Id*. at 8.]

On September 25, 2012, GCC completed the sale of $600 million of 5.750% Senior Notes due 2022 in a private placement offering (the "Note Offering"). [D.E. # 107 at 8.] The offering memorandum incorporated by reference GCC's financial statements in its 2011 Form 10-K, First

Quarter 2012 Form 10-Q, and Second Quarter 2012 Form 10-Q, which contained the material misstatements and omissions stemming from the overstatement of ROW inventory.  [*Id.*]

On September 28, 2012 – and with the Note Offering safely closed – Cidre finally emailed Robinson in order to set up a call to discuss a "serious issue with Brazil's inventory valuation that I need to make you aware of."  GCC immediately launched an investigation and audit based on the revelation of the inventory overstatement and, on October 29, 2012, reported to investors that GCC needed to restate its prior financials, could not be relied upon.  Ultimately, in a March 1, 2013 Form 10-K/A, GCC restated its annual earnings from 2009 to 2011, and the first two quarters of 2012 which reflected the cumulative overstatement of GCC Brazil's inventory was more than $47 million.

### B. Chakraborty's Purported Expert Opinions

On August 24, 2018, Cidre disclosed Chakraborty as a testifying expert witness in this case.  A copy of her expert report is attached as Exhibit A.  In her report, Chakraborty identified her assignment as being hired by Cidre's counsel to:  (1) measure the reaction of GCC's stock price to disclosures of the inventory accounting errors; (2) assess the economic materiality of the inventory accounting errors to a reasonable investor; (3) assess the economic materiality of the alleged omissions and misstatements in the September 2012 Offering Memorandum; and (4) review and respond to certain statements contained in the Expert Report of Gerard A. Guild.[2]  (Ex. A, Chakraborty Rep. at 6.)

Among other things, Chakraborty constructed an event study to assess what she refers to as the "economic materiality" of the Company's disclosures relating to the financial impact of the

---

[2] The SEC previously disclosed Gerald Guild as a testifying expert in this case.  On November 26, 2018, the SEC withdrew him as a testifying expert.  Insofar as Chakraborty is allowed to provide testimony at trial, the SEC respectfully requests any rebuttal opinions directed towards Mr. Guild be prohibited as irrelevant and prejudicial.

inventory accounting errors. Ultimately, Chakraborty disclosed the following opinions regarding the inventory overstatement that is central to this case:

- GCC's alleged corrective disclosures regarding the financial impact of the inventory accounting errors, including the March 1, 2013 filing of GCC's restated financial statements, had no measurable impact on its stock price;

- GCC's disclosures regarding the financial impact of corrections related to value added tax and revenue recognition in connection with bill and hold transactions at facilities in Brazil, including the January 21, 2014 filing of GCC's restated financial statements, had no measurable impact on its stock price; and

- Chakraborty said she "[found] no evidence that a correction of the alleged omissions and misstatements in advance of the September 2012 Note Offering would have impacted a reasonable investor's assessment of the September 2012 Note Offering.

(Ex. A at 7-8.) In sum, and of particular note for this *Daubert* motion, Chakraborty's expert report and testimony concludes that "[b]ased on quantitative and qualitative analyses, ***I conclude that the alleged omissions and misstatements related to the inventory accounting errors were not economically material*** to reasonable investors in GCC's stock or private placement notes." (*Id*.) (emphasis added).

As argued below, Chakraborty's opinions go a bridge too far by declaring "immaterial" Cidre's omissions and misstatements regarding the GCC ROW inventory overstatement at issue in this case. Perhaps, realizing this, she attempts to cure this overstep by simply slapping the word "economically" before material. At best, her proposed testimony would confuse and mislead the jury by blurring the terms she defined in her analysis with legal terms to be defined by this Court, applicable case law, and jury instructions to be charged by this Court. At worst, her opinions would allow her to testify as to her improper legal conclusions regarding materiality thereby taking it out of the hands of the jury. The applicable case law and Federal Rules of Evidence prohibits expert testimony from doing either.

## III. LEGAL STANDARD

### A. Rule 702 and the *Daubert* Standard

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony. It allows an expert to give opinion testimony in a case, provided that "scientific, technical, or other specialized knowledge will assist the trier of fact." Fed. R. Evid. 702. When determining the admissibility of expert testimony under Fed. R. Evid. 702 and pursuant to *Daubert*, the Court engages in a three-part inquiry which considers whether:

> (1) the expert is qualified to testify competently regarding matters she intends to address; (2) the methodology by which the expert reaches her conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Brown v. NCL (Bahamas) Ltd.*, 190 F. Supp. 3d 1136, 1140 (S.D. Fla. 2016) (Lenard, J.) (citations omitted). While *Daubert* addressed admissibility of scientific evidence, this standard has been extended to all testimony based on technical or other specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The Eleventh Circuit has highlighted the importance of this gatekeeping function; it is because expert witnesses are free to opine without firsthand knowledge, while relying upon otherwise inadmissible hearsay, that courts must carefully judge the intellectual rigor employed by the expert. *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004). The burden of laying the proper foundation for the admission of expert opinion testimony rests with the party offering that testimony. *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002).

### B. Proposed Expert Opinions Must Also Be Analyzed under Fed. R. Evid. 403

Additionally, this Court's *Daubert* analysis does not operate in a vacuum. Any proffer of purported expert evidence is also subject to other rules of evidence, including Federal Rule of

Evidence 403. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999) Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, ***confusion of the issues, or misleading the jury***, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." (emphasis added.) In particular, expert opinion evidence, even if relevant, if its probative value is substantially outweighed by the danger of confusion of the issue or misleading the jury. *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).

In fact, the Supreme Court recognized the intricate role of Rule 403 in an expert testimony admissibility analysis when it noted that expert testimony could be "both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citations omitted). *See, e.g., Hull v. Merck & Co., Inc.,* 758 F.2d 1474, 1477 (11th Cir. 1985) (per curiam) (finding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702").

### C. An Expert's Opinions Cannot Dictate to the Jury What Result to Reach Nor Can They Usurp the Court's Role in Instructing the Jury About the Law

Particularly relevant to this motion, an expert "may not testify to the legal implications of conduct" or "tell the jury what result to reach." *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114 at 1128-29 (11th Cir. 2018) (citations omitted). Rather, the Court must be the jury's only source of law and questions of law are not subject to expert testimony. *Id*. Ultimately, the Court must be vigilant against admission of legal conclusions, and of specific importance in this case, an expert witness may not substitute for the Court in charging the jury regarding the applicable law. *Id*. at 1129 (citing *United States v. Milton*, 555 F.2d 1189, 1203 (5th Cir. 1977). Moreover, the

Court must take adequate steps to protect against the danger than an expert's opinion would be accepted as a legal conclusion. *Id.* (citing *United States v. Herring*, 955 F.2d 703, 709 (11th Cir. 1992).

## IV. ARGUMENT

### A. Chakraborty's Opinions Cannot Be Allowed to Decide the Issue of Materiality

In this case, many of the claims against Cidre require the SEC to establish materiality in order to prove liability at trial. For example, in the context of Counts I and II against Cidre alleging violations of 10(b) of the Exchange Act of 1934 (the "Exchange Act") and Section 17(a) of the Securities Act of 1933 (the "Securities Act"), respectively, materiality is "defined as information that is substantially likely to be important to a reasonable investor in deciding whether to purchase, sell, or hold securities." *SEC v. Monterosso*, Case No. 07-61693, 2008 WL 11333251 at *5, (Sept. 26, 2008) (Lenard, J.) (citing *SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1303 (M.D. Fla. 2007)).

Predictably, the thrust of Chakraborty's opinions is to deem the inventory overstatement at issue in this case immaterial. As stated above, Chakraborty's ultimate opinion is that "the alleged omissions and misstatements related to the inventory accounting errors were not economically material to reasonable investors in GCC's stock or private placement notes." (Ex. A at 8.) At deposition, Chakraborty clarified that "…***part of my assignment in this case was to assess the materiality of the collective – all of the disclosures***, so I don't want to just limit it to the October disclosure, but to the disclosures, to a reasonable investor." (Chakraborty Dep. Tr. dated 10/24/18 at 56:8-12, attached hereto as Exhibit B) (emphasis added.) She further testified "[s]o, basically, in this case I was assessing the materiality of information on stock price and bonds." (Ex. B at 42:14-16) With regard to the materiality of the inventory overstatement as to investors in GCC's debt,

Chakraborty conceded:

> That's why you have the models that look at these things in the aggregate. And I want to just emphasize the fact that a lot of what we're looking at is in the past and has nothing to do with the future. So that's why all of those three things collectively ***inform my opinion that this is not material or can't be material to an investor in the debt***.

(Ex. B at 219:20 – 220:2) As such, if allowed to testify at trial, Chakraborty will undoubtedly dictate to the jury that Cidre's misstatements and omissions were immaterial.

Such testimony would be wholly improper. An expert witness "may not testify as to the legal implications of conduct." *Montgomery v. Aetna Casualty & Surety Co.,* 898 F.2d 1537, 1541 (11th Cir. 1990). In other words, an expert cannot simply offer testimony that summarily concludes Cidre's misstatements and/or omissions are immaterial. *See e.g., In re BankAtlantic Bancorp, Inc. Sec. Litig.*, Case No. 07-61542-CIV, 2010 WL 6397500, at *12 (S.D. Fla. Aug. 18, 2010) (precluding an expert's opinion that the subject of the alleged misstatements were material to investors because it tracked the language of the legal standard for materiality) (citing *Montgomery*, 898 F.2d at 1541) (holding that an expert may not merely tell the jury what conclusion to reach or testify as to the legal implications of conduct). *See also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's."); *Hoefer & Arnett, Inc. v. Lehigh Press, Inc.* Case No. 86-7016, 1988 WL 12505, at *1 (E.D. Pa. Feb. 16, 1988) ("[P]laintiffs' experts are precluded from testifying to legal conclusions of "materiality."). Thus, Chakraborty should not be allowed to testify that she has concluded that Cidre's misstatements and omissions are immaterial. Nor should Cidre be allowed to reference these conclusions in any fashion before the jury.

### B. Chakraborty's Use of the Term "Economic Materiality" Is a Transparent Attempt to Insulate Her Opinions from *Daubert* Attack and Will Necessarily Lead to Jury Confusion

Perhaps realizing that it is improper for her to simply tell the jury to reach a conclusion about materiality, Chakraborty attempts at cloak her materiality finding as involving "economic materiality" not legal materiality. When asked about any differences between the two terms, Chakraborty concedes that materiality is a legal term. (Ex. B at 57:1-3.) She then testified as to how she perceives the difference between economic materiality and materiality:

> Economic materiality, to me is I'm looking at this from the perspective of the investor. So that's what I'm referring to, is so does that info – was the information economically material, such that it would change either the value of the security in question or the way that the investor would either view the value or would it change their investment decision. That's how I define for purposes of the analyses.

(*Id.* at 57:6-14.) When pressed as to whether and how her concept of "economic materiality" overlapped with the concept of materiality in the Federal Securities Law, Chakraborty refused to draw any real distinction:

> Q. Do you view that economic materiality as being any different as materiality as used in that – in the Federal Securities Law?
>
> A. That's what I'm not opining on. So there is a legal concept of materiality, that is not something that I'm opining on. What I'm opining on is economic materiality as I just defined it.
>
> Q. Do you understand there to be a difference?
>
> A. There could be.
>
> Q. Okay. What is that difference then?
>
> A. So I'm not – I'm not a legal expert, and I'm not an accounting expert.

(Ex. B at 57:19 – 58:5.)

Obviously, the law applicable to this case does weigh in on the concept of materiality. The Eleventh Circuit has held that a misstatement or omission is material – for the purposes of finding

a violation of the Federal Securities Laws – if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available. *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (citing *TSC Indus. v. Northway,* 426 U.S. 438, 449 (1976). The Eleventh Circuit Pattern Jury Instructions define materiality as follows:

> A misrepresentation or omission of fact is "material" if there is a substantial likelihood that a reasonable investor would attach importance to the misrepresented or omitted fact in determining his course of action. Put another way, there must be a substantial likelihood that a reasonable investor would view the misstated or omitted fact's disclosure as significantly altering the total mix of available information. A minor or trivial detail is not a "material fact."

Eleventh Circuit Pattern Jury Instructions § 6.2 at 4 (2018).

Chakraborty's definition of "economic materiality" is co-extensive with the legal definition of materiality, yet she refused to concede the obvious:

> A.  So the way that people use those terms can be different. The way that I'm using those terms is the way that I just defined it.
>
> \*   \*   \*
>
> A.  So is the information important enough or significant enough that it would either change the value of the security or the way in which an investor would evaluate that security.
>
> Q.  A reasonable investor?
>
> A.  A reasonable investor, correct.
>
> Q.  Do you understand that to be any different than the way that materiality is defined in the Federal Securities Laws?
>
> A.  So, again, I'm not trying to be difficult, but I don't – I don't want to make any presumptions of how materiality is defined for legal purposes or accounting purposes.
>
> Q.  You don't know if there is a difference or not?
>
> A.  Yeah, I don't have an opinion on that.

(Ex. B at 58:7 – 59:1.)

On this point, Chakraborty cannot have it both ways. Either her concept of "economic materiality" is essentially defined the same as legal materiality would be in the Eleventh Circuit, or her concept is significantly different. Neither option leads to admissible expert testimony. In the first instance, Chakraborty's opinions are inadmissible because they seek to instruct the jury on the law and ultimately decide the issue of materiality. As discussed in section IV.A. *supra*, that is improper and such expert testimony should be excluded. In the second instance, her use of the term "economic materiality" would necessarily confuse a jury. For example, if allowed to testify, the jury would be required to parse Chakraborty's definition of "economic materiality" and determine how – if it all – it relates to and impacts materiality. Such a chore should not be hoisted upon the jury. Forcing the jury to deconstruct two almost identical terms with similar but not precisely the same meaning or legal effect all but ensures jury confusion. Such expert testimony is properly kept from the jury. *Rouco*, 765 F.2d at 995; *Hull,* 758 F.2d at 1477.

### C. Chakraborty Should Not Be Allowed to Offer Her Opinions in an Improper Attempt to Instruct the Jury Regarding the Meaning of the Term "Reasonable Investor"

In reaching her proposed expert opinions in this case, Chakraborty assessed the impact of GCC ROW's inventory overstatement on a "reasonable investor." (Ex. B at 66:24-67:2). Chakraborty testified as to how she defined the term in reaching all of her opinions in this case:

Q. How do you define a reasonable investor?

A. ***So I consider a reasonable investor to be something that approximates the market.*** So, you know, there's lots of information out there. So, again, you know I'm looking at – you know, one of the reasons why economists like to look at stock price movements to assess this kind of thing, is because it collectively takes into account the entire – all of the information in the market, and everyone's opinion, not just a single analyst or a single person. It's collectively assessing all of the information and behavior in the market, with respect to trading, and with respect to volume and how they're making their decisions. And that's getting imputed into the stock price. That's why the stock price, to an economist, when you're looking at economic materiality, is so

> important, because it's taking into account the aggregate market, as opposed to a subset or a single person or a single decision.

(Ex. B at 67:5-24) (emphasis added).  Rather than simply define her understanding of a reasonable investor, Chakraborty claimed that the results and outcome of the market as a whole.  Under further questioning, Chakraborty attempted to refine her definition:

> Q. But I just want to make sure I'm understanding how you – for purposes of your study, a reasonable investor is what?
>
> A. It would – again, it's what I said. ***It's sort of the collective view of investors in the stock.***  That's what's causing – that's what – that's what you're viewing when you look at the market price.  That market price is being determined by a series of trades.  Right?  There's trading activity all of the time, buyers and sellers.  And that's what causes – ***sort of the intersection of supply and demand is what's determining the price here.  And that's made up of an aggregate number of buyers and sellers.  And those are the investors.  So, collectively, that is a reasonable investor.***  The outcome represents the opinions of a reasonable investor.

(Ex. B at 68:3-19) (emphasis added).

Similar to the admissibility issues with her take on materiality, the problem here is that Chakraborty's opinions – if admitted – would improperly affect the jury's understanding and definition of the term "reasonable investor."  This is important because, as discussed above, the term "reasonable investor" will appear in the jury instructions for this case.  *See supra* at 11.  The Court should not allow Chakraborty to dictate the definition of the terms within the jury instructions.  If allowed to present her opinions to the jury, Chakraborty will necessarily testify as to her understanding of a reasonable investor and how she used it in her analysis.  In doing so, the jury would be hearing from both Chakraborty and the Court about what constitutes a reasonable investor.  And, based on her expert report and deposition testimony, there would be significant conflict between the two definitions, which is inappropriate and must be prevented.  This Court

must be the jury's only source of law, and an expert cannot be allowed to testify as to the legal implications of conduct. *Montgomery*, 898 F.2d at 1541.

Finally, as was the case with Chakraborty's use and definition of materiality – or as she describes it "economic materiality" – there is significant risk that a jury would be confused between the meaning of the term "reasonable investor" in the jury instruction and the meaning of the very same term within Chakraborty's analysis and opinions. In fact, it is important to note that both of these terms – as she defines them – are absolutely crucial to her analysis and ultimate conclusions. For one – but certainly not the only – example, her report concludes:

> …I conclude that a ***reasonable investor*** would not find the financial impact of the inventory accounting errors to be ***economically material*** to the valuation of GCC's stock.

(Ex. A at 16.) (emphasis added). Thus, these terms are integral to each and every one of her proffered opinions. Nor can Chakraborty simply slap a different term on a concept to distinguish it from terms to be defined by this Court. That is merely a distinction without a difference, which could easily lead to jury confusion. Such a risk strongly militates towards excluding Chakraborty's opinions. *Rouco*, 765 F.2d at 995; *Hull,* 758 F.2d at 1477.

## V. <u>CONCLUSION</u>

As discussed above, Chakraborty's report, analysis, and proffered testimony should be completely excluded from the jury. Her opinions are improper because they seek to: (1) dictate to the jury a finding regarding the element of materiality in the SEC's claims; (2) usurp the Court's role in instructing the jury on the law; and (3) cause unnecessary jury confusion with regard to key terms within the required jury instructions for the SEC's claims. Accordingly, the Court should therefore exclude Chakraborty's expert testimony at trial in its entirety.

## VI. REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), the SEC requests a hearing on this Motion of no less than ninety minutes, which would include Chakraborty's testimony, if needed. A hearing is necessary because of the great risk of Chakraborty: (1) intruding on the Court's role in instructing the jury on the law; and (2) misleading and confusing the jury. The detailed and complex nature of her proposed opinions also compels a hearing on this Motion.

Pursuant to Local Rule 7.1(a)(3), the undersigned counsel for the SEC has conferred with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so.

Dated: November 30, 2018

Respectfully submitted,

By: /s James M. Carlson
James M. Carlson (S.D. Fla. Bar # A5501534)
Email: CarlsonJa@sec.gov

Olivia S. Choe (Special Bar No. A5501503)
Email: choeo@sec.gov

Kevin C. Lombardi (Special Bar No. A5501411)
Email: lombardik@sec.gov

Rachel Nonaka
Email: nonakar@sec.gov

Mark Oh (Special Bar No. A5502125)
Email: OhMa@sec.gov

U.S. Securities and Exchange Commission
100 F Street N.E.
Washington, DC 20549
Facsimile: (202) 772-9291

***Attorneys for Plaintiff United States
Securities and Exchange Commission***

## CERTIFICATE OF SERVICE

I hereby certify that, on November 30, 2018, a true and correct copy of the foregoing was filed and served via CM-ECF upon all counsel listed below:

**Counsel for Defendant Sandoval**

| | |
|---|---|
| Susan Katherine Bozorgi | Steven Robert Kozlowski |
| Susan Wright Van Dusen | Yolday Diaz Barreto |
| Marrero Bozorgi, PL | Kozlowski Law Firm, PA |
| 201 Alhambra Circle, Suite 1050 | One S.E. Third Ave., Suite 1660 |
| Miami, FL 33134 | Miami, FL 33131 |
| 305-577-9711 | 305-673-8988 |
| Email: sbozorgi@marrerobozorgi.com | Email: steven@klfpa.com |

**Counsel for Defendant Cidre**

| | |
|---|---|
| Susan E. Brune | Scott Alan Srebnick |
| Erin C. Dougherty | 201 South Biscayne Boulevard |
| Brune Law P.C. | Suite 1210 |
| 450 Park Avenue | Miami, FL 33131 |
| New York, NY 10022 | 305-285-9019 |
| (212) 668-1900 | Fax: 305-377-9937 |
| Email: sbrune@brunelaw.com | Email: scott@srebnicklaw.com |

**Counsel for Defendant Miranda**

Angel A. Cortinas
Gunster
Brickell World Plaza
600 Brickell Ave, Suite 3500
Miami, FL 33131
Email: acortinas@gunster.com