EXHIBIT B

**Page 1**

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF FLORIDA
2
   _____
3              )
   UNITED STATES SECURITIES AND    )
4  EXCHANGE COMMISSION,            )
         Plaintiff,  )  Case No.
5               )  17-cv-20301-JAL
   vs.           )
6  MATHIAS FRANCISCO SANDOVAL      )
   HERRERA and MARIA D. CIDRE,     )
7               )
         Defendants.  )
8  _____)
9
10       VIDEOTAPED DEPOSITION OF MAUREEN CHAKROBORTY, Ph.D.
11       (Volume 1, pages 1 - 238 inclusive)
12       Wednesday, October 24, 2018
13       9:39 a.m.
14       Taken at:
15       The Analysis Group
16       10 Rockefeller Plaza
17       New York, New York
18
19
20
21
22
23
24 Reported by:
   AMANDA GORRONO, CLR
25 JOB No. 181024PXL

**Page 2**

1  APPEARANCES OF COUNSEL:
2
3  FOR THE PLAINTIFF, UNITED STATES SECURITIES AND
4  EXCHANGE COMMISSION:
5  UNITED STATES SECURITIES AND EXCHANGE COMMISSION
6  BY:    KEVIN C. LOMBARDI, ESQUIRE
7         JAMES M. CARLSON, ESQUIRE
8         Division of Enforcement
9         100 F Street, N.E.
10        Washington, DC 20549
11        Telephone:  202.551.4881
12        E-mail:  carlsonja@sec.gov
13            lombardik@sec.gov
14
15 FOR THE DEFENDANT, MARIA D. CIDRE:
16        BRUNE LAW, P.C.
17        BY:  ERIN C. DOUGHERTY, ESQUIRE
18        450 Park Avenue, Suite 1901
19        New York, New York 10022
20        Telephone:  212.668.1900
21        E-mail:  Edougherty@brunelaw.com
22
23
24
25

**Page 3**

1  APPEARANCES OF COUNSEL:  (CONTINUED)
2  FOR THE DEFENDANT, MATHIAS FRANCISCO SANDOVAL HERRERA:
3      MARRERO BOZORGI, PL
4      BY:  SUSAN BOZORGI, ESQUIRE
5      201 Alhambra Circle, Suite 1050
6      Coral Gables, Florida 33134
7      Telephone:  305.577.9711
8      E-mail:  sborzorgi@marrerobozorgi.com
9
10 ALSO PRESENT:
11      DAVID SHERECK, VIDEOGRAPHER
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1                INDEX
2  WEDNESDAY, OCTOBER 24, 2018
3  MAUREEN CHAKROBORTY
4                          Page
5      Examination by    MR. CARLSON        8
6
7
8             -o0o-
9
10 QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
11        (NONE)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5:

```
 1                    EXHIBITS
 2  MAUREEN CHAKROBORTY
 3  Number        Description              Page
 4  Exhibit 200   Notice of Deposition       11
 5  Exhibit 201   Brune Law Document         12
 6  Exhibit 202   Form 12B-25 filing
 7                For General Cable
 8                Corporation              138
 9  Exhibit 203   November 15, 2012 Form 8-K   145
10  Exhibit 204   February 8, 2012 Form 8-K    152
11  Exhibit 205   Cincinnati Business
12                Courier Article          155
13  Exhibit 206   October 2012 Calender    160
14  Exhibit 207   Newspaper Article        163
15  Exhibit 208   Bloomberg Screen Printout  166
16  Exhibit 209   Edward Altman Article    221
17  Exhibit 210   November 12, 2013 Form 8-K  234
18
19
20
21
22
23
24
25
```

Page 6:

```
 1           PREVIOUSLY MARKED EXHIBITS
 2  Number       Description              Page
 3  Exhibit 146  CV of Maureen Chakroborty    19
 4  Exhibit 158  October 28, 2012             91
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7:

```
 1         WEDNESDAY, OCTOBER 24, 2018
 2                A.M. SESSION
 3     THE VIDEOGRAPHER:  We're on the record.
 4  The time is approximately 9:39 a.m.  Today's date is
 5  Wednesday, October 24, 2018.  This is the video
 6  deposition of Maureen Chakroborty in the matter of
 7  Securities and Exchange Commission versus Mathias
 8  Francisco Sandoval Herrera, et al., Case Number is
 9  17-CV-20391, the United States District Court,
10  District of Southern Florida.
11     My name is David Shereck, certified legal
12  video -- videographer with Gradillas Court Reporting
13  of Glendale, California.
14     We're located today at the office of The
15  Analysis Group at 10 Rockefeller Plaza, New York,
16  New York.
17     And will counsels please first identify
18  yourselves and whom you represent.
19     MR. CARLSON:  James Carlson for the
20  Plaintiff, Securities and Exchange Commission.
21     MR. LOMBARDI:  Kevin Lombardi for the
22  Securities and Exchange Commission.
23     MS. BOZORGI:  Susan Bozorgi for Mathias
24  Sandoval.
25     MS. DOUGHERTY:  Erin Dougherty for Maria
```

Page 8:

```
 1  Cidre.
 2     MS. BRUNE:  Susan Brune also for Maria
 3  Cidre.
 4     THE VIDEOGRAPHER:  Thank you.  The court
 5  reporter today is Amanda Gorrono, also with
 6  Gradillas.  And will you please swear in the
 7  witness.
 8     MAUREEN CHAKROBORTY,
 9  Called as a witness, having been first duly sworn,
10  was examined and testified as follows:
11  EXAMINATION BY
12  MR. CARLSON:
13     Q.  Good morning.
14     A.  Good morning.
15     Q.  Now, we've met before, obviously, but my
16  name is James Carlson.  I'll be asking you some
17  questions today.
18        Would you prefer Dr. Chakroborty or
19  Ms. Chak -- do you -- what do you prefer?
20     A.  Whatever you prefer.
21     Q.  Okay.
22     A.  Either is fine.
23     Q.  Okay.  But it is Chakroborty, I got that
24  right?
25     A.  It is Chakroborty.  You do have that
```

1    **Q.** A substantial number of times?
2    **A.** It's a substantial number, right. It's a
3  23-year career, so whatever that works out to. I've
4  had a lot of different clients.
5    **Q.** Have your clients only been in the
6  litigation environment?
7    **A.** No.
8    **Q.** Okay. What other client profiles do you
9  handle at Analysis Group?
10    **A.** So, in addition to litigation, over my --
11  I'll do this over my career.
12    **Q.** Sure.
13    **A.** I've worked with a number of companies in
14  the bankruptcy and restructuring space. I've also
15  done quite a bit of consulting work on -- in
16  tax-related matters that are not litigation-focused.
17      There's also -- from time to time, you
18  know, we get some one-off calls to do things that
19  are not in the litigation phase, but companies have
20  questions about things or they're looking into
21  things, sometimes it's pre-litigation, sometimes
22  it's not. So it varies a lot.
23      You know, people tend to call us based on
24  the expertise we provide, as opposed to sort of what
25  venue we're going to do it in.

41

1    **Q.** Is the methodology that you apply for a
2  litigation client different than any other client
3  that you would work for at Analysis Group?
4    **A.** No.
5    **Q.** Okay. How would you describe your
6  methodology?
7    **A.** It depends on what I'm doing.
8    **Q.** How would you describe your methodology in
9  this case?
10    **A.** So in this case I did a number of different
11  things. That's a very broad question, so I'll
12  answer it sort of at the higher level and --
13    **Q.** Let's start broad and we'll drill it down.
14    **A.** -- you can ask me to follow up. So,
15  basically, in this case I was assessing the
16  materiality of information on stock price and bonds.
17  So to do that, I did a number of things. One of the
18  things I did was an event study. We can talk about
19  that, if you'd like. Another thing that I did is I
20  looked at -- well, I also looked at other
21  information in the market at the time, so not just
22  the event study, but I looked at all of the market
23  information around that event study, so including
24  things like consensus, analyst estimates, how they
25  changed, what they -- you know, what they changed,

42

1  how they changed, why they changed. I looked at
2  things like management guidance over the time, both
3  in the quarters and in the fiscal years, in the
4  fiscal years going forward.
5      I did some analysis on stock price
6  valuations, that's in the report. On the bond side,
7  I looked at a number of different metrics that
8  investors will typically look at to assess credit
9  rate -- to assess credit risk and other risk.
10      I also looked at -- in addition to looking
11  and those metrics singularly. I also contemplated
12  them in the aggregate, using a model for that.
13    **Q.** Okay.
14    **A.** There's probably other things I did, but
15  that's essentially the methodology that I use.
16    **Q.** So in approaching that methodology, which I
17  understand is broad --
18    **A.** Right, it has a lot of pieces.
19    **Q.** Right. It has a lot -- and we'll look at
20  those piece by piece.
21      But when looking at your methodology, there
22  were certainly a set of factual assumptions that you
23  used, correct?
24    **A.** Well, if something is a fact, it's a fact,
25  not an assumption. So I don't know what you mean by

43

1  factual assumptions.
2    **Q.** Well, let's break that out. Were there any
3  assumptions that you used in conjunction with your
4  methodology in forming your opinions in this case?
5    **A.** I mean, my analysis is based on a lot of
6  facts. You know, there -- then there are
7  applications of those facts. So I'm just struggling
8  with what you mean by assumption in this case.
9    **Q.** Let me clarify. So you would agree with me
10  that the facts in this case, and you can look at it
11  and there are any number of facts that are listed in
12  the financial filings, that are, you know, either
13  documents in the case or testimony, correct?
14    **A.** Correct.
15    **Q.** And you make a decision about whether or
16  not to look at certain facts or look at certain
17  dates, correct?
18    **A.** I mean -- I mean, I looked at all of the
19  financial information, and then I -- I look -- you
20  know, I use that financial information to test
21  certain hypotheses. So I'm trying to understand
22  your -- your -- what your --
23    **Q.** Well, for example, in your event study --
24    **A.** Yes.
25    **Q.** -- you would agree that there are certain

44

1    **A.** But I did see it.  I had access to it.
2    **Q.** Okay.  Were you -- did you ever ask any of
3  the defendants' lawyers for documents and were
4  refused documents?
5    **A.** No.
6    **Q.** Did you conduct any interviews of the
7  defendants in order to --
8    MR. CARLSON:  Well, withdraw that again.
9    **Q.** Did you ever conduct any interviews of the
10  defendants in drafting your expert report?
11    **A.** No.
12    **Q.** Did you ever conduct any interviews of
13  anybody in drafting your expert report?
14    **A.** No.
15    **Q.** Okay.  You were aware that there was a firm
16  that performed general cable company audits,
17  correct?
18    **A.** Correct.
19    **Q.** That was Deloitte, correct?
20    **A.** Deloitte, correct.
21    **Q.** And you didn't interview anybody from
22  Deloitte?
23    **A.** No.
24    **Q.** Did you do any independent research of
25  Deloitte's audits other than what's listed in your

53

1    **A.** Correct.
2    **Q.** So, let's take a look at the first one.
3  One is to measure the reaction of GCC stock price to
4  disclosures of the inventory accounting errors?
5    **A.** Correct.
6    **Q.** Now, I just want to make sure that we're
7  talking about the same thing.  Inventory accounting
8  errors, we're -- are we talking about those errors
9  that were disclosed in GCC's October 29, 2012, Form
10  8-K?
11    **A.** Correct.
12    **Q.** Those are the ones in Brazil?
13    **A.** Well, actually -- actually, I'm going to --
14  I'm going to amend my answer on that, because I
15  actually didn't just look at the October disclosure.
16  I also looked at each of the restatement dates.
17    **Q.** Okay.
18    **A.** And the other dates where there were
19  announcements about the accounting errors related to
20  the value added tax and the bill and hold.  So I
21  actually looked at all of those dates.
22    **Q.** Okay.  But that would include the
23  October 29, 2012 date, correct?
24    **A.** It would certain include that date,
25  correct.

55

1  report?
2    **A.** Of their audits?
3    **Q.** Uh-huh.
4    **A.** I did not look at their audit work papers.
5    **Q.** Did you review any of Deloitte's work at
6  all in coming to the conclusions in your report?
7    **A.** I have seen E-mails from Deloitte, I've
8  seen certain documents that they've -- that they
9  prepared, yes.  But I didn't do any audit work.
10    **Q.** And then the E-mails that you would have
11  reviewed from Deloitte should be on that Appendix B,
12  correct?
13    **A.** That's correct.
14    **Q.** And that would be under the case materials?
15    **A.** That's correct.
16    **Q.** So, if we could go to the section of your
17  report that talks about the scope of your
18  engagement.  And I believe it starts at Page 6.
19    **A.** Okay.
20    **Q.** And it's under Roman Numeral III, for
21  assignment.  Do you see that?
22    **A.** I do.
23    **Q.** And you would agree that these four bullet
24  points -- or these four letter points, outline the
25  scope of your engagement for this case, correct?

54

1    **Q.** And we'll go through each of those dates --
2    **A.** Okay.
3    **Q.** -- here in a little bit.
4    When you said -- why specifically were you
5  looking at the stock price reaction to the
6  inventory, to the disclosure of the inventory
7  accounting errors?
8    **A.** Because part of my assignment in this case
9  was to assess the materiality of the collective --
10  all the disclosures, so I don't want to just limit
11  it to the October disclosure, but to the
12  disclosures, to a reasonable investor.  So putting
13  yourself in the shoes of a typical investor in both
14  equity and in debt, mainly what I'm considering is
15  market information.
16    So, you know, investors see certain
17  information, that's the information I also looked
18  at.  And one way to assess whether or not
19  information is important to a stock price is to look
20  at how the stock price reacts to the information
21  when it's disclosed.  So that's what that's getting
22  at.
23    **Q.** So throughout your report you use a term
24  called economic materiality?
25    **A.** Correct.

56

1    **Q.**  Do you see a difference between economic
2  materiality and materiality?
3    **A.**  To me, materiality is a legal term.
4    **Q.**  Okay.
5    **A.**  So I'm not here to talk about what a legal
6  definition of something is.  Economic materiality,
7  to me is I'm looking at this from the perspective of
8  the investor.  So that's what I'm referring to, is
9  so does that info -- was the information
10  economically material, such that it would change
11  either the value of the security in question or the
12  way that the investor would either view the value or
13  would it change their investment decision.  That's
14  how I define for purposes of the analyses.
15    **Q.**  Sure.  But you understand that the Federal
16  Securities Laws talk about materiality as a
17  component of certain claims, correct?
18    **A.**  Correct.
19    **Q.**  Do you view that economic materiality as
20  being any different as materiality as used in that
21  -- in the Federal Securities Law?
22    **A.**  That's what I'm not opining on.  So there
23  is a legal concept of materiality, that is not
24  something that I'm opining on.  What I'm opining on
25  is economic materiality as I just defined it.

57

1    **Q.**  Do you understand there to be a difference?
2    **A.**  There could be.
3    **Q.**  Okay.  What is that difference then?
4    **A.**  So I'm not -- I'm not a legal expert, and
5  I'm not an accounting expert.
6    **Q.**  Right.
7    **A.**  So the way that people use those terms can
8  be different.  The way that I'm using those terms is
9  the way that I just defined it.
10    **Q.**  Okay.  All right.
11    **A.**  So is the information important enough or
12  significant enough that it would either change the
13  value of the security or the way in which an
14  investor would evaluate that security.
15    **Q.**  A reasonable investor?
16    **A.**  A reasonable investor, correct.
17    **Q.**  Do you understand that to be any different
18  than the way that materiality is defined in the
19  Federal Securities Laws?
20    **A.**  So, again, I'm not trying to be difficult,
21  but I don't -- I don't want to make any presumptions
22  of how materiality is defined for legal purposes or
23  accounting purposes.
24    **Q.**  You don't know if there is a difference or
25  not?

58

1    **A.**  Yeah, I don't have an opinion on that.
2    **Q.**  Okay.  So we were talking a bit about the
3  reaction of the stock price as a gauge for, as you
4  call it, economic materiality, correct?
5    **A.**  Correct.
6    **Q.**  There was also private placement offering
7  memorandum dated September 25, 2012, that you looked
8  at, correct?
9    **A.**  Correct.
10    **Q.**  Is it your opinion that the reaction of the
11  GCC stock to the October 29th disclosure, and other
12  dates, is in any way related to the valuation of the
13  September private placement memo?
14    **A.**  I'm sorry, your question doesn't make sense
15  to me.
16    **Q.**  Okay.  What doesn't make sense?
17    **A.**  You asked me about the valuation of the
18  private placement memo.  I don't know what that
19  means.
20    **Q.**  The value -- I'm sorry, the valuation of
21  the private placement?
22    **A.**  So you're talking about the valuation of
23  the bonds?
24    **Q.**  Correct.
25    **A.**  Now, can you restate the question.

59

1    **Q.**  I'll try it again.  Is the -- your opinions
2  regarding movement of GCC stock in relation to
3  certain event dates, is that in any way related to
4  the valuation of the private placement?
5    **A.**  So, one of -- so, I'm going to give you a
6  partial answer on that.  Yes, but I'm going to
7  caveat that a little different than the way you
8  phrased it, is that the stock price movement in
9  October was, in large part, due to the private
10  placement that had preceded it, and the effect of
11  the private placement, particularly the amount of
12  interest associated with those bonds on the value of
13  the equity.  So those two things are related, yes.
14    **Q.**  Okay.  And how do you find that they are
15  related?
16    **A.**  So when you think about the valuation of a
17  security, you know, investors, analysts, the
18  company, you value a security on a number of
19  different metrics, but one of the metrics that you
20  look at is earnings.  It's an important metric.  And
21  with the private placement there was a considerable
22  amount of additional interest that the company was
23  going to be paying going forward, and that lowered
24  the earnings and the earnings per share fairly
25  significantly in the fourth quarter and in the

60

1    So when you net out the market and the
2  industry effects, then you have normal volatility.
3  If a stock price movement falls outside of the range
4  of expected normal volatility, then that's
5  considered to be an abnormal movement, which means
6  that there was something specific on that day that
7  caused the stock price to move, specific to the
8  company.  That's what that means.
9    **Q.**  So is it your opinion then that if a stock
10  movement is not statistically significant, then it
11  is not economically material?
12    **A.**  That's correct.  And the reason is because
13  you can't distinguish it from normal volatility in
14  the absence of any information.  So, in other words,
15  the information was not important enough to cause
16  the stock price to move in a way that is meaningful
17  relative to volatility, normal volatility, assuming
18  nothing else was announced.
19    **Q.**  But in that understanding, the only thing
20  that judges, in your mind, thens whether or not
21  something is economic mat -- is material, is whether
22  or not you had a statistically significant stock
23  movement?
24    **A.**  That's one of the things we look at.
25    **Q.**  Okay.

65

1    **A.**  It's not the only thing we look at, but
2  that is one of the tests that we look at.
3    **Q.**  Okay.  Could you have something that's
4  economically material without a material stock move,
5  based on other variables?
6    **A.**  So you can't conclude -- so if you have a
7  stock price movement that's not statistically
8  significant, then you can't conclude that the price
9  is reacting to information versus just normal
10  volatility.  So, you have -- in order -- one of the
11  things that you would want to look at is, if you've
12  done your event study right, then you should be able
13  to conclude based on statistical significance, if
14  the information was important enough to cause the
15  stock price to change.
16    **Q.**  Okay.
17    **A.**  If you've done it right.
18    **Q.**  Okay.  Depending on other variables then?
19    **A.**  Well, yes, you have to control -- that's
20  why I say, if you've done it right, you have to
21  control for a lot of different things.
22    **Q.**  Including confounding events?
23    **A.**  Including confounding events.
24    **Q.**  Okay.  Let's move on to your assignment for
25  12B, which is "to assess the economic materiality of

66

1  the inventory accounting errors to a reasonable
2  investor."
3    Do you see that?
4    **A.**  Correct.
5    **Q.**  How do you define a reasonable investor?
6    **A.**  So I consider a reasonable investor to be
7  something that approximates the market.  So, you
8  know, there's lots of information out there.  So,
9  again, you know I'm looking at -- you know, one of
10  the reasons why economists like to look at stock
11  price movements to assess this kind of thing, is
12  because it collectively takes into account the
13  entire -- all of the information in the market, and
14  everyone's opinion, not just a single analyst or a
15  single person.  It's collectively assessing all of
16  the information and behavior in the market, with
17  respect to trading, and with respect to volume and
18  how they're making their decisions.  And that's
19  getting imputed into the stock price.  That's why
20  the stock price, to an economist, when you're
21  looking at economic materiality, is so important,
22  because it's taking into account the aggregate
23  market, as opposed to a subset or a single person or
24  a single decision.
25    **Q.**  Okay.  But you're -- so I think you

67

1  identified the market and how the market reacts.
2    **A.**  Right.
3    **Q.**  But I just want to make sure I'm
4  understanding how you -- for purposes of your study,
5  a reasonable investor is what?
6    **A.**  It would -- again, it's what I said.  It's
7  sort of the collective view of investors in the
8  stock.  That's what's causing -- that's what --
9  that's what you're viewing when you look at the
10  market price.  That market price is being determined
11  by a series of trades.  Right?  There's trading
12  activity all of the time, buyers and sellers.  And
13  that's what causes -- sort of the intersection of
14  supply and demand is what's determining the price
15  here.  And that's made up of an aggregate number of
16  buyers and sellers.  And those are the investors.
17    So, collectively, that is a reasonable
18  investor.  The outcome represents the opinions of a
19  reasonable investor.
20    **Q.**  And just, again, so I understand this.
21  You're essentially defining reasonable investor as
22  the collective market reaction to an event?
23    **A.**  That's how we're measuring it, but I'm --
24  that's -- the reaction is not the reasonable
25  investor, that's the outcome of the reasonable

68

1   **A.** That's not a very big difference.
2   **Q.** Okay.  What would be a big enough ratio
3   change to draw the attention of a reasonable
4   investor?
5   **A.** I mean, we're talking about a change of
6   .14.
7   **Q.** No, I understand that.  What I'm trying to
8   get at is what is --
9   **A.** Yeah.
10  **Q.** What -- I get that --
11  **A.** Yeah.
12  **Q.** -- that's the ratio which you're saying is
13  not --
14  **A.** Yeah.
15  **Q.** It does not raise to the level --
16  **A.** It doesn't raise an eyebrow, yeah.
17  **Q.** What would raise an eyebrow?
18  **A.** It depends -- it's going to depend on the
19  context.  So, you know, part of the issue here is
20  you're asking me a question, you're asking me to
21  look at something in isolation.  And that's really
22  not the way that credit is assessed.  That's why you
23  have to look at all ten.  You have to look at all of
24  them.  And you have to look at them in combination
25  with one another.  Because there's no -- there is no

217

1   -- there is no such -- you know, there's no if this
2   is greater than this, then this happens.  Because
3   all of these things are happening simultaneously.
4   **Q.** So --
5   **A.** And many ratios are changing, right?
6   **Q.** Right.
7   **A.** I'm sorry, I'm just trying to give you a
8   complete answer.
9   **Q.** Go ahead.
10  **A.** So what I would point you to is the second
11  part of this analysis, is that once you look at all
12  of this stuff individually, you really want to look
13  at it in the aggregate.  That's the way -- investors
14  all have models, the credit rating agencies all have
15  models, and so they are looking at combinations of
16  these metrics in conjunction with one another.  And
17  that's how they assess it.  So you can't really look
18  at one in isolation.
19  **Q.** So if you were to zero in on any of those
20  ratios and just look at fiscal year 2011, whatever
21  the ratio change is for fiscal year 2011, you say
22  that's ultimately not that useful in determining
23  credit risk, it's just when you combine all the
24  variables?
25  **A.** Yeah.  I mean, it is helpful to look at

218

1   them.  But, you know, a couple of things that I
2   note, again, is that none of these ratios change in
3   any large way.  Two, these are all changes in the
4   past.  None of -- none of the assessment
5   forward-looking is changing.
6         That -- that -- that's really the
7   fundamental key issue here, is that the
8   forward-looking expectations as a result of this are
9   not changing.
10        So, models don't take into account just the
11  past.  That's why I'm saying you can't just look at
12  this in isolation, because what matters is what do
13  people think the earnings are going to be next
14  quarter, because they don't get paid based on what
15  happens in the past, they get paid based on what
16  happens in the future.  So that's --
17  **Q.** And you --
18  **A.** So that's -- sorry.
19  **Q.** Go ahead.
20  **A.** That's why you have the models that look at
21  these things in the aggregate.  And I want to just
22  emphasize the fact that a lot of what we're looking
23  at is in the past and has nothing to do with the
24  future.  So that's why all of those three things
25  collectively inform my opinion that this is not

219

1   material or can't be material to an investor in the
2   debt.  It doesn't change the metrics enough, not
3   only in the past, but it doesn't change them at all
4   in the future.
5   **Q.** Is that why you do an Altman Z Score
6   analysis, because it combines all of those ratios?
7   **A.** It combines five of them.
8   **Q.** Five of them.
9   **A.** And the reason why I showed more than five
10  is some of these are substitutable for each other.
11  So different people look at different ones.  It just
12  depends if different -- you know, if you look at
13  S&P, they have a different credit scoring model than
14  Moody's does.  They all have proprietary
15  information.
16        So Altman Z gives you -- takes five of them
17  and they combine them into an aggregate and they
18  come up with a number.  And I think what I do show
19  in the report is the number doesn't change.  The
20  aggregate number doesn't change at all.  So that's a
21  very strong indication to me that the historical
22  changes don't -- didn't change the credit profile of
23  the company looking backward, and we know it doesn't
24  change it looking forward, because management
25  guidance tells you that, consensus tells you that.

220